The opinion of the court was delivered by
BxracAN, J.
The several questions raised on this record are important,-and have received all the consideration their importance demands.' It was an action of assumpsit, on a parol guarantee of the solvency of the debtor, and the adequacy of the lands mortgaged to pay the mortgage money. -The assignments of the bond and mortgage were made under seal, and in the presence of two *324 witnesses, and contained no covenant except tbe one implied by the words, “assigned and set over,” which would not reach the solvency of the debtor or the sufficiency of the estate mortgaged. The only real matter in controversy is, whether the action could be sustained upon the parol agreement to warrant, and the lawfulness of the consideration of the promise. Other incidental matters arose on the trial, which have given rise to several exceptions, which will be considered in their order.
The first error assigned, is in the admission of the answers of Constant Williams to certain interrogatories exhibited by the plaintiff below, the defendant in error, on account of their leading character. Some of these interrogatories had a leading cast, and might, in a certain shape, have been excepted to; but the defendant below joined in the eqmmission, and exhibited his cross-interrogatories to the witness, on the same questions which he now complains of as leading. In chancery, on a return of the commission and publication, if a party neglect to move for a suppression on this ground, he is too late to object on the hearing. Here, having joined in the commission and interrogated on the same questions, I think that he is too late with this exception on the trial. I can see no reason to distinguish this from Sheeler v. Speer, 3 Binn. 133, where it was decided, that a party present, and cross-examining, cannot object .to leading questions in the deposition, on the trial. It is as much a waiver, as permitting the question to be answered without objection. It is something more than a treacherous silence, which would be acquiescence. It is a positive waiver. I must confess, I am not disposed to lend a ready ear to objections kept in reserve, until it is too late for a party to remove them. It is a snare into which his opponent has led him, and ought not to avail him. In Jones v. Lucas, 1 Rand. 368, this very point was decided. It was there held, that where a deposition is introduced on a trial at law, regularly taken on a commission, and an objection is made to some of the questions as leading ones, the court cannot suppress these questions and answers, after the jury is sworn; but the objection should be made before the jury is sworn, and the exceptionable questions and answers suppressed..
The second error assigned, is to the charge of the court, and brings out the question, as to an assignee sustaining such an action on a parol guarantee, where the written assignment contains no such covenant. The objection was not made to the competency of the evidence, as being by parol, to contradict or add to a written agreement, but to its operation when received. The defendant below made no objection to this medium of proof as be ought to have done, but I am willing to allow.' him the full benefit of the exception; and my opinion is, that the evidence was competent, and, if believed, sufficient to charge him in this form of action.
The evidence was, that Overton represented to Traeey, that *325 tbe value of the lands in mortgage was double the sum for which they were mortgaged, and that Dreio, the mortgagor, was in solvent circumstances, and able to pay the amount of the mortgage money; and, in the event of a failure on Drew’s part, he would be accountable for the value contained in the mortgage and bond, amounting to the sum of fifteen hundred and ninety dollars: That Tracey observed to Overton, that this guarantee should be reduced to writing; to which Overton replied, it was unnecessary, that some witnesses were present who could establish the fact; and that the defendant never was in solvent circumstances, and the property was totally inadequate; that it had been sold on the mortgage, and did not bring more than one-tenth of the debt, and the purchaser at sheriff’s sale offered to let Overton have it back on the térms he had bought it.”
Had this been an assignment, expressed to be without recourse, it would have presented a different question, for then the writing would have shown that all recourse was excluded. But the evidence was of a thing, not in terms contradictory of the deed, but explaining what was intended by the assignment, and that the pro-, .vision for recourse was particularly stipulated, which was not inserted by the fraud of Overton; for a fraud it would be in Overton, if Tracey insisted on the. stipulation being inserted in the instrument, and it was omitted by the persuasion of Overton, for him now to avail himself of an omission, of which he was the cause. There is nothing in the instrument inconsistent with this guarantee. So far from this, the courts of Virginia hold, that the as-signee of a bond, without any express agreement on the part of the assignor, having used due diligence to secure tbe money, has an implied right to recover by action of assumpsit, against the assignor, unless there be an agreement to the contrary, or special circumstances, to show that it was not so intended by the parties at the time of the assignment. The assignment, as they hold, importing, itself, a debt due from the assignor, the right not being given by the act of assembly authorizing the assignment, but existing at the common law; so that unless there is an express stipulation, or something to show the contrary to have been the intention of the parties, the assignor is liable by operation of law. McLean’s Executors v. Davis, 2 Wash. 219. Goodwin v. Sterrett, 2 Hen. & Munf. 189. This, however, is not so considered with us, and is only cited to show, that the stipulation to guaranty, is not inconsistent with the assumpsit, though an implied assump-sit would not arise by operation of law.
It is not my intention to attempt to reconcile all the decisions on this head of evidence. This would be a difficult task to afccom-plish, pnd beyond my powers. It does not, however, follow, that because parol evidence in this ease may be admitted, if is therefore admissible in all. But it may be confidently said, that decisions have established the principle, that relief may be granted *326 against deeds on the ground of fraud, mistake, oppression, or imposition. The general principle is, that parol evidence, where there is a deed, is not to be admitted in all cases, nor is it to be refused in all. Each must depend on its own circumstances. Where fraud intervenes, there the evidence may be introduced. If it was admitted in all, justice would be subverted. If it was refused in cases of imposition, fraud would be protected. It is one of the most important offices of a court of chancery, and in which it is much employed, to correct mistakes and fraudulent omissions in deeds. The courts do not vary the deed, but if there be a frudulent omission, it is an equity dehoi's the deed; and when a court of chancery cannot satisfy itself of the fact, an issue may be directed to try the question, as was done in The South Sea Co. v. Dagliffe, 2 Ves. 377. Dagliffe agreed not to carry goods, under certain circumstances. If information was given in two months after his return home that he had done so, then he was to pay certain damages. The instrument was not drawn up, until on board the ship and in a great hurry, and then executed by Dagliffe. When he got out to sea and read it over, he found it was six months instead of two, and brought a bill to be relieved against that variance in the instrument, the company having brought an action on it. Lord King.sent it to an issue, and it was tried on the question, whether it was the original agreement, that it should be two instead of six months: a verdict was given in favour of the plaintiff, that it was designed to be in two months; and, in consequence of this, Lord Talbot made a decree to relieve the plaintiff against any difficulty by the variation. Undoubtedly there will be found a hesitancy in admitting parol evidence to correct agreements and mistakes, and it ought to be strong and irrefragable evidence; but fraud, in equity, is an exception to every rule; and if the bill in chancery states, that the clause intended to be inserted was suppressed by fraud, chancery never refuses relief on a fraud made out. The only difficulty is in deciding, what should be deemed fraud. If one of the contracting parties insists on a certain stipulation, and desires it may be made a part of the written agreement, and the other by his promise to conform to it, as if it was inserted in the written instrument, prevents its insertion, this is a fraud, and chancery will enforce the agreement as if the stipulation had been inserted. Having no court of chancery, our common law courts have constantly acted upon this principle, from Thomson v. White, 1 Dall. 424, to Christ v. Diffenbach,1 Serg. & Rawle, 464, in a succession of decisions varying in their circumstances, but all bottomed upon this principle. It is laid down, in a work of acknowledged authority, (Sugden on Vendors, 128.) that if the parties object to a conveyance, on account of a term of the agreement being omitted, and the party promise to rectify it, whereupon the deed is executed, a specific performance of the promise will be enforced. And this form of action is, with us, in nature of a bill in *327 equity, to compel the specific performance of a promise. Here the promise was to make good the mortgage; to make it available; bring the money; or, in the words of the witness, collectable. In the main, this was the charge of the court, and it is free from the imputation of error. '
The charge on the second point is likewise free from error. It was not necessary for Tracey to give notice to Overton of the' failure of Drew to pay the instalments. It has no relation to notice of nonpayment, in order to charge the indorser of negotiable paper. The interests of commerce require that this should be strictly done; but, in this case, it was the business of Overton to look to the ability pf Drew to pay the debt. The proof was, that Drew was never able to pay any thing, as he never had any thing but a yoke of oxen and a cart, and the land was poor and sterile. He should have well known his capacity, when he entered into this voluntary warranty and induced Tracey, on his representations, to take the assignment of the debt. His promise was, that the land should bring the money, or, if it did not, he would be accountable for it. In all cases of this kind the rule is plain, if the guarantee proceeds fairly in his prosecution to recover the debt, if he has given notice to the voucher, the record of this proceeding-is conclusive. If he does .not give notice, it is incumbent on him, on the trial to prove, that he pursued the original debtor with all good faith, ánd that he failed, not by his own negligence, but because the debtor was never in such a situation that he could probably recover from him. The principle is stated, in Gibbs v. Cannon, 9 Serg. & Rawle, 201, to be, that the guarantor of a note does not stand in the same situation as parties to the note. It is not like an action on the indorsement. It is in the nature of an insurance of the debt, and there is no need of the same proof to charge him, as there is an indorser.- It is sufficient for him to show that he could not have obtained the money, by making the demand. The necessity of a demand, in order to charge the in-dorser of a bill is solely founded on the custom of merchants, and it only applies to actions on the indorsement, which is an action on the bill itself, and does not apply to any case where the guarantor is not an indorser, and the action not on the indorsement. It would follow, from this principle, that the guarantee might recover in this case, on his agreement as to the solvency of Drew, and the adequacy of the mortgaged premises, and that without notice of the nonpayment of the instalments, as they become due, unless indeed it had been proved, which was not pretended, that Overton had received prejudice from the want of notice, or could have received benefit from notice. The poverty of Drew was proved, his inability to pay was not contradicted by any witness, nor was it proved that the land had grown more sterile, or was deteriorated by Drew. Overton assumed to pay, if Drew did not; and, if the money could not be raised by a sale of the land, he *328 ought to have taken notice. It was necessary neither to allege, nor to prove it. 5 Com. Dig. 53. Cro.Jac 68. It is a duty which the law enjoins on such guarantor, to see that the debt is paid. King v. Balawin, 2 Johns. Ch. 559.
This answers the fourth assignment of error. He was not bound to bring an action on each instalment as it became due, because it would have been a fruitless act, and because Overton guarantied that the mortgaged lands should bring the debt on a sale under the mortgage. Neither party, it would seem, looked to the solvency of Drew, but to the solvency of the land, — that the money should be collectable from the land.
The fifth, specification is, that the court erred in the opinion, that the plaintiff was not bound by the statute of limitations until six years after the last instalment became due. If this had been an action of deceit on Overton's false representation, the opinion would have been erroneous; but it was on his assumption with respect to the security of the mortgage being an available one. . Tracey could not proceed to sue on the mortgage until one year after the last instalment became due. Until the property was sold, it could not be known but that it would be available. The deficiency could no otherwise be ascertained. The cause of action did not accrue until that was ascertained, and until the cause of action accrued, the statute would not begin to run. The proper plea, in such case, would not be non assumpsit infra sex annos; but ■causa actionis non accrevit infra sex annos.
The sixth point. If this had been the assignment of the bond and moitgage, in consideration of the sale and conveyance of a title under Connecticut, to one not holding or representing the Pennsylvania title, the consideration would have been illegal, and no action would have grown out of it. It is a matter in which the Pennsylvania legal owner must rejoice equally with the Connecticut pretender, that this bone of contention no longer exists. It had distracted the state for nearly forty years. It had nearly-caused a civil war. Some valuable lives were lost in the contest. It is now happily settled, I must say with great sacrifice of the Pennsylvania rights; but it is settled, and I shall regret to see its remembrance kept alive by a construction which would do no credit to the Pennsylvania claimant, for the plea is a most ungracious one; but ungracious as it may be, still, if the contract falls within the letter and policy of the acts protecting the sale and transfer of Connecticut titles, it must be sustained. The act of the 11th of April, 1795. 3 Sm. L. 209, is for the punishment of intruders under the Connecticut pretensions, and persons combining and conspiring for the purpose of conveying, possessing, or settling within the limits of Pennsylvania, under such titles. This transaction cannot fall under this act. It savoured not of an intrusion under the Connecticut title, nor was it a combining for conveying, possessing, or settling under such title, but was the- *329 very reverse; the surrender up and extinction of that title. The act on which the plaintiff in error relies, is the act of the 6th of April, 1802, 3 Sm. L. 525 If we look to the objects of the legislature, as they appear in the title and are stated in the preamble to that act, they prove any thing else than an intention of the legislature to prevent the holder of the Pennsylvania title from settling down on his land, peaceably obtaining a surrender of the possession of the Connecticut intruder. It is entitled, “ au act to maintain the territorial rights of the state, and to protect the property of persons holding lands under the same;” and the preamble states, that “certain persons, under pretence £f titles derived from Connecticut, have endeavoured by improper pretences, to ,defame the titles of persons holding lands by grant from this state, &c., in order to counteract such practices, and preserve the just rights of the state,” it enacts that no conveyance of lands within the counties of Luzerne, Lycoming, and Wayne, shall pass any estate, where the title is not derived from this state, and inflicts a penalty on any judge or justice for receiving proof of, or recorder for recording a deed of that description, and forbids every one interested in a Connecticut title, from sitting as a judge or juror in any case where such title may come in question; and it lastly provides, that every person settling, or purchasing, or in any manner contracting for land under the Connecticut title, shall forfeit two hundred dollars. The object of this act was to maintain the territorial rights, of the stale, protect the property of persons holding under the state, and cut up the Connecticut titles by the roots. But I am far from considering it to be an infraction of that law, for a Pennsylvania holder to agree with a settler under' the Connecticut title to surrender the possession to him, the.rightful owner. The improvements, buildings, and crop in the ground might be worth more than the sum given for the surrender. There was nothing in a moral or legal point of view vicious in the Pennsylvania rightful owner, agreeing to pay the Connecticut man for his labour of many years on his lands, however unlawful his original entry may have been, nor in the Connecticut man abandoning that, which, at one time, he might have conscientiously settled, under the belief that the Connecticut title was valid. Though it must be admitted, after the decree made at Trenton, to have been a most extraordinary delusion, yet I will not say, that such infatuation was impossible. Nor can I perceive any thing in the transaction against the letter, spirit, or policy of any act of assembly, forbidding the Connecticut settler, saving to the Pennsylvania landholder, t£ I am sick of this strife, I am not willing longer to hold out against your title and the laws of this state; pay me the value of my permanent improvements, my buildings, and my crop in the ground; I will move off; I will go further into the wilderness, and acquire a lawful and rightful possession.” There is nothing in an agreement founded on these considerations for- *330 bidden by any law. Nor for l.he legal owner to say, Surrender your possession, and I will pay you for the labour you have spent upon my land; go away in peace, arid I will pay you for your crop.” If this was all, there would be nothing forbidden. It cannot render it vicious, because the Connecticut man surrenders with his improvements, every vestige of claim, every worthless rag of conveyance. There is so much natural justice in this, it so much tends to accomplish that which the state had at heart, for which she sacrificed so much, the establishment of peace in her borders, th^t I shall be sorry t.o find in the pages of any of her laws a provision of this kind, which would ever subject the holder of the Pennsylvania title to a forfeiture of two hundred dollars for doing that which his interest and conscience dictated to him, by a correct, beneficial, pure, and proper arrangement, consistent with the true policy of the laws against these intruders, and the' true interest of the commonwealth.
This was not a matter of law, depending upon the legal construction of the writing alone. Facts dehors the deed were to be. considered, before it could be pronounced whether the parties to the contract transgressed any law. To do this, it was necessary to ascertain the situation of the parties, and there the jury were properly instructed by the court, that if they found that Overton represented, or was in truth the owner of the Pennsylvania title, and Tracey, who had made permanent and valuable improvements under the Connecticut title, contracted for the surrender of these to the rightful owner of the soil, and that this, and not the Connecticut title, was the consideration for the assignment of Drew’s bond and mortgage, then the plaintiff was entitled to recover. The jury would judge, from the amount of the consideration, whether it was the value of a fee simple title, or merely a compensation for improvements. There was evidence to show, that it was the surrender of the possession and improvements to the Pennsylvania right that was the consideration of the assignment, and. not an act hostile to the sovereignty of the state, or her territorial rights, or defaming the title of persons holding by grant from the state; but a submission to the state and her laws, by. a surrender of all hostile pretensions; not receiving compensation or allowance for the soil, supposing it to be in Tracey, but a compensation agreed to be made by him who was to be benefited by them, for the substantial improvements made on his land, to him who made them.
The plaintiff in error has failed in sustaining any of his exceptions, either to the evidence or the opinion of the court, and the judgment stands affirmed.
Judgment affirmed.