MARTINDALE
v.
MOORE.

MARTINDALE, Administrator, *v.* MOORE, Administrator.

The statute of 1822,—enacting that no mispleading, or lack of pleading, should *thereafter* render any executor or administrator personally liable,—has no application to a judgment rendered previously to the statute.

ERROR to the *Wayne* Circuit Court.

*Wednesday,
November 27.*

STEVENS, J.—On the 16th day of *July*, 1821, one *Mordecai Mendenhall*, in an action of debt against *Martindale*, the plaintiff in error, and one *William Young*, the administrators of one *Jesse Young*, deceased, recovered a judgment for 356 dollars debt, and 7 dollars and 12 cents damages, together with costs, &c. by default, to be levied of the goods and chattels of the deceased, in the hands of the said administrators, *Martindale* and *Young*, to be administered, if they had so much in their hands, but if they had not, then the damages aforesaid to be levied of the proper goods and chattels of the said administrators. After the rendition of this judgment, *Mendenhall*, the plaintiff, died intestate, and administration of his personal estate was granted to *Moore*, the defendant in error; and on the 5th day of *April*, 1829, said judgment was by default revived in the name of *Moore*, the administrator. Afterwards, a writ of *fi. fa.* issued on the judgment and was returned *nulla bona*. *Moore* then declared against the administrators, *Martindale* and *Young*, on said judgment in an action of debt, averring waste, &c. To this action, *Martindale*, the plaintiff in error, appeared and pleaded in bar, that neither he nor his co-administrator received any notice of said debt due from the deceased, *Jesse Young*, to said *Mendenhall*, until long after they had fully administered, &c.; and that on the 16th day of *June*, 1821, at the time of the rendition of the aforesaid judgment in favour of said *Mendenhall* against him and his co-administrator, they had nothing in their hands to be administered, &c.; and that nothing has since come to their hands, &c. To this plea, the plaintiff in the Court below demurred, and the demurrer was sustained and judgment rendered against *Martindale* for the amount due to the estate of *Mendenhall*, &c., to be levied of his own proper goods and chattels.

The only question before this Court is, whether the plea of

*Martindale* is sufficient in law to bar the action of *Moore*, the plaintiff?

The sufficiency or insufficiency of that plea, depends entirely upon the construction and effect which the Court may give to the 7th section of an act approved the 22d day of *January*, 1822, entitled "an act amendatory to an act entitled an act authorising the granting of letters testamentary and letters of administration," &c.  The 7th section of that act is in these words, viz.—"No mispleading or lack of pleading shall, *hereafter*, render any executor or administrator liable to pay any debt of the deceased, damages, or costs, beyond the actual amount of assets which shall or may come into his, her, or their hands."  At common law, if an executor or administrator failed to plead that he had fully administered, such failure to plead operated as an admission that he had assets sufficient to satisfy the demand.  He was forever afterwards estopped, by this implied admission of assets, from pleading that he had fully administered.  By this implied admission of assets, arising from a failure to plead at the proper time the plea of *plene administravit*, executors and administrators might sometimes, possibly, be misled to their injury.  To remedy this, the before recited section of the statute of 1822 was enacted.  The original judgment on which the proceedings in this case are founded, was rendered against the plaintiff in error, about six months before that statute was enacted, and nearly or quite a year before it was in force in the county where the judgment was rendered and where the parties resided.

The defendant in error insists, that if the act of 1822 is so construed as to authorise the defence set up in the plea to the action in the Court below, it is unconstitutional and void:—1. because it will be repugnant to that part of the constitution of the *United States*, and of this state, prohibiting the passage of *ex post facto* laws; 2. because it will be repugnant to that part of those constitutions prohibiting the passage of laws impairing the obligation of contracts; and 3. because it will have a retrospect beyond the period of its enactment, and will divest or impair the rights of the defendant in error, which vested in him previous to the passage of the law, and will be repugnant to a fundamental principle of universal jurisprudence and of the common law, and will therefore be null and void.

The constitution of the *United States* and of this state, both

prohibit the passage of *ex post facto* laws, or laws impairing the obligation of contracts.

The first thing then to be determined is, whether this section is an *ex post facto* law? Blackstone defines an *ex post facto* law to be a law made after the commission of an indifferent act, declaring the act to be a crime, and inflicting a punishment upon the person who committed it.

The first case in which the meaning of the phrase *ex post facto*, as used in the constitution of the *United States*, came to be considered, was that of *Calder* v. *Bull*, 3 Dall. 386. The meaning and extent of the phrase were extensively discussed by several of the judges on that occasion. The case was this:—Mrs. *Calder* claimed a certain estate as heiress to one *Morrison; Bull* and wife claimed the same estate by devise from the same *Morrison*, and the original question in the Probate Court of *Connecticut* was *devisavit vel non*. On the 21st day of *March*, 1793, the Court set aside the will and refused to record it; by that decree the estate vested in Mrs. *Calder* as heiress, &c. By the laws of *Connecticut*, no new trial could be granted by the Probate Court, or appeal, or writ of error be had, unless applied for within eighteen months after the rendition of the decree, which in that case was not done. In 1795, the legislature by a resolution granted a new trial, with liberty to appeal, &c. A new hearing was had and the will was sustained; and Mrs. *Calder* lost the estate. The case finally came before the Supreme Court of the *United States*, and it was there contended, that the resolution of the legislature granting the new trial, was an *ex post facto* law, in the sense of the constitution of the *United States*. The Court, however, held that the words *ex post facto* were technical expressions, and meant laws that made an act done before the passing of the law, and which was innocent when done, criminal; or which aggravated a crime, and made it greater than it was when committed; or which changed the punishment, and inflicted a greater punishment than the law annexed to the crime when it was committed; or which altered the legal rules of evidence, and received less or different testimony than the law required at the time of the commission of the offence, in order to convict the offender; and that the resolution granting the new trial, was not within either the letter or intention of the prohibition.

Afterwards, in the case of *Fletcher* v. *Peck*, 6 Cranch, 87,

the Court observed that an *ex post facto* law was one which rendered an act punishable in a manner in which it was not punished when it was committed; and that such a law might inflict penalties on the person, or might inflict pecuniary penalties; and that the legislature was prohibited from passing any law by which a man's estate, or any part of it, shall be seized for a crime which was not declared by some previous law to render him liable to that punishment.   This definition, Chancellor Kent says, is distinguished for its comprehensive brevity and precision.   Tucker, in his commentaries, says that Blackstone's definition of an *ex post facto* law has been adopted by the Courts of the *United States*, in their construction of that phrase in the constitution; and that an *ex post facto* law is not considered as extending to matters of contract, or to questions of civil right or private property, but is confined to statutes of a penal character.

Whether these adjudications respecting the meaning of the phrase *ex post facto* were originally correct, we shall not inquire; the point is settled and binding upon us, and we are disposed at all times to stand by things as decided.   The statute under consideration not being penal in its character, cannot therefore be *ex post facto*.

The next point is, whether it is a law impairing the obligation of a contract?   This prohibition on the legislature of a state is of great moment, and affects extensively and deeply its authority.   It has given rise to various able discussions, and to protracted litigation.   Therefore, a brief review of some of the most important judicial decisions, defining and enforcing this prohibition, may perhaps be proper.

The case of *Fletcher* v. *Peck*, 6 Cranch, 87, brought this prohibitory clause into direct discussion.   The legislature of *Georgia*, on the 7th day of *January*, 1795, granted a tract of land to *James Gunn* and others, a company known by the name of the *Georgia* company.   Afterwards, on the 13th day of *February*, 1796, about thirteen months after the passage of the act making the grant, the legislature repealed that act, and in the repealing act declared, that the act making the grant was a positive and clear act of usurpation, made without any constitutional authority, and that it was wholly null and void from the beginning, having been obtained by fraud, corruption, and undue influence; and that all grants contained in it were null

and void, and of no binding force or effect, and that they never had any legal existence; and that neither the act, nor any grant or patent under it, should be read as evidence in any Court of justice. But the Supreme Court of the *United States* said that a contract was a compact, and is either executory or executed; that an executory contract is one in which a party binds himself to do or not to do a particular thing; and that a contract executed, is one in which the object of the contract is performed, and this differs in nothing from a grant; that the contract between *Georgia* and this company was executed by the grant; and that a contract executed, as well as an executory contract, contains obligations binding on the parties; that a grant, in its nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right; and that in fact, a grant is a contract executed, and that its obligation as such continues in force, and therefore it must be construed to be within the prohibition of the constitution. The Court, further, unanimously declared that the state of *Georgia* was not only restrained by the constitution, but also by general principles, from passing a law divesting the company of their rights.

The case of *The State of New-Jersey* v. *Wilson*, 7 Cranch, 164, is also an important case on this point. It is this:—The colonial legislature of that state, in 1758, passed an act authorising the purchase of land for the *Delaware* Indians, and declared in the act that *the lands*, when so purchased, should not be subject to taxation. Lands were accordingly purchased and conveyed to trustees, for the use of the Indians. The Indians occupied the lands until 1803, when the legislature authorised them to sell them, and they accordingly did sell, and the lands became the individual property of citizens of the *United States*. In 1804, the legislature repealed the act of 1758, and subjected the lands to taxation; but the act of 1758 was held to be a contract, and that the act of 1804 repealing it, impaired the vested rights of the owners of the lands, and was therefore void. In the case of *Terrett* v. *Taylor*, 9 Cranch, 43, it was held that a legislative grant vested an irrevocable title, and could not be revoked by legislative enactment, it being tantamount to an executed contract. In the case of the *University* v. *Foy*, 2 Hayw. 310, the Supreme Court of *North Carolina* pronounced a statute void, which repealed a grant to the university, although

Nov. Term, 1833.

MARTINDALE
v.
MOORE.

the university in the first instance, received the grant from the state as a gift, by an act of the legislature. In the case of *Pawlet* v. *Clark*, 9 Cranch, 292, the same principle is established, and the principle carried, perhaps, something further. The Court declares, that no legislative act can divest even a town corporation of a vested right to property; that such an act is not only unconstitutional, but is contrary to the solid principles of just legislation.

But in the great case of *Dartmouth College* v. *Woodward*, 4 Wheat. 518, this subject was most elaborately discussed both by the counsel and by the Court. The substance of that case is this:—Dr. *Wheelock* founded a charity on funds owned and procured by himself, and he was the sole dispenser, legal administrator, and owner of the funds; he made his will, devising this property in trust to continue the existence and uses of a certain school. He then applied to the king of *England* for a charter for the persons by name, whom he had by his will appointed to be the future trustees of his charity. In 1769, the king, by his letters patent, created and established a corporation. The preamble to the charter cites, that it is granted at the request of Dr. *Wheelock*, and that he is the founder. The letters patent then proceed to appoint the twelve persons named by the doctor the trustees, by the name of the "Trustees of Dartmouth College," who should have perpetual existence as such corporation, with power to hold and dispose of the lands and funds for the use of the college, together with the ordinary powers of a corporation. They were to employ and pay a president, tutors, ministers, and other officers of the college, at discretion. There were to be forever twelve trustees and no more, with the right of filling all vacancies in their own body. To the trustees were given the superintendence and visitation, together with power to appoint and remove all officers at their discretion, and to fix the amount of salaries. This corporation was created and went into effect before the revolution, and after it had exercised its corporate powers and rights for about fifty years, the legislature of *New-Hampshire*, (the state in which it is situated,) declared by a legislative act, that the public good and the interests of the institution required that the charter should be amended; and accordingly passed an act against the will of the corporation, amending the charter; by which amendatory act, nine new trustees were created and added to the

board, making in all twenty-three trustees instead of twelve. A new board of twenty-five persons was also created, who were to oversee the institution, &c. This amendatory act was declared by the Court null and void. The Court stated, that the constitution embraced every species of contract respecting property and objects of value, and which confer rights that may be asserted in a Court of justice, and that the charter granted by the king was a contract. Judge *Story* said, that the constitution extended to all manner of contracts and grants, whether beneficial or not to the person in whom the rights and privileges secured by them vested.

Again, in the case of *Green* v. *Biddle*, 8 Wheat. 1, it was observed by the Court, that the objection to a law on the ground of its impairing the obligation of contracts, could not depend upon the extent of the change effected by it; any deviation from its terms, by postponing or accelerating the period of its performance, imposing conditions not expressed in the contract, or dispensing with conditions that are expressed, however minute or apparently immaterial in their effect upon the contract, or upon any part or parcel of it, impairs its obligation; and that upon this principle it is, that if a creditor agrees with his debtor to postpone the day of payment, or in any other way to change the terms of the contract, without the consent of the surety, the latter is discharged, although the change may be for his benefit. In that case, it was decided that a compact between two states was a contract within the meaning of the constitution.

There have been various other decisions in the *United States*, on the insolvent and bankrupt laws of the several states, still further defining what is a contract within the meaning of the constitution, and what is a law impairing the obligation of a contract within that prohibition. Most of these decisions were reviewed by this Court at the *November* term, 1831, in the case of *Pugh* v. *Bussel*, and need not at this time be further adverted to.

This branch of the case has been thus particularly examined, for the purpose of ascertaining whether the judicial decisions would, under any view of the case, bring the statute now under consideration in conflict with that part of the constitution prohibiting the passage of laws impairing the obligation of contracts; but no decision has been found that appears clearly to

authorise such a construction, and to say the least of it, it is certainly doubtful.

The next inquiry is, whether, if this 7th section is so construed as to authorise the defence set up in the plea to the action in the Court below, it will have a retrospect beyond the time of its enactment, and thereby impair rights which vested in the defendant in error before the passage of the act?

A vested right is defined to be the right the person has, in whom it vests, to do certain acts, or to possess, occupy, own, or enjoy, certain things, or to ask, demand, recover, and receive, certain things, according to the law of the land at the time; and a law is deemed retrospective which takes away, or impairs in any manner, such vested right.

The position assumed by the plaintiff in error is, that the statute under consideration only changes a rule of evidence in relation to certain suits, which might be brought against executors or administrators to make them personally liable for wasting the assets; and that it relates only to such suits as should be brought after the passage of the act, and is therefore prospective in its effect only, and is not retrospective; that by the law as it stood at the time of the rendition of the original judgment against him, the judgment was of itself sufficient evidence to establish the fact that he had a sufficiency of assets; and that in this suit against him, to make him personally liable for having wasted the assets, the plaintiff would not, by the law as it then stood, have needed any evidence, other than the judgment itself, to prove the waste; and that the only change effected by the statute is the repeal of that rule of evidence; that since the passage of that act, the judgment is not evidence of the waste of the assets, but that the plaintiff is now required to prove the waste *aliunde*.

Although this position, to say the least of it, is very plausible, and at the first blush strikes the mind with some force, yet it is apprehended that it is not tenable. The premises from which the conclusion is drawn are not correct, and hence the conclusion cannot be. It is assumed as a fact, that although by the law as it stood before the passage of this act, the judgment by default would have of itself been sufficient evidence to prove that the administrator had wasted the assets, yet that he would have had a right to make an issue, to be tried, of waste or no waste. But such is not the fact: the administrator by failing to

plead the plea of *plene administravit* to the original suit, impliedly confessed that he had assets sufficient to pay the demand; and as the law then stood, he was bound the instant that judgment was rendered, to pay the amount, whether he had assets of the intestate or not. He was, by that failure to plead, estopped as to that demand, and his liability to pay it irrevocably fixed. Every person is bound to know the law, and so was this administrator: he was bound to know that if he failed to plead that he had no assets, it was in law a confession that he had assets; and that it was an irrevocable presumption in law, if he did not so plead, that he intended it as a confession that he had assets, and would be held liable accordingly. Such was the law at that time, and the administrator was bound to know it. The judgment, then, which was rendered against him, was not merely evidence that he had assets, but it forever estopped the administrator from pleading that he had none. All litigation as to assets was at once at an end, and the plaintiff's right to recover against the administrator, on a suggestion of waste, was complete and irrevocable. The defendant was not permitted to make an issue of waste or no waste, as he appears to suppose he was.

If, then, the statute of 1822 has so impaired the force and effect of that judgment, as to open the door of litigation which was forever closed, and permit the administrator now to come in and say that he has no assets, and that he is not therefore liable to pay that judgment, it must be retrospective in its effect, and it does impair clear, valuable, and distinct rights, which, by the law of the land, vested in the defendant in error long before that statute was enacted.

By way of illustration we will make a case. By the law as it now is, a failure on the part of an executor or administrator to plead that he has fully administered, is not a confession that he has assets, nor does it estop him from afterwards pleading that he has none. Now suppose the legislature should repeal the present statute and revive the old law, Would that make executors and administrators who had failed to plead that they had fully administered, and had let judgments go against them by default under the law as it now is, liable to pay those judgments whether they had assets or not? Would they be estopped from making that defence which the laws of the land authorised them to make when the judgments were rendered? No,

36*

certainly not. All, it is presumable, would with one voice say that such a construction would be unjust, that such a law would be retrospective, and that it would impair vested rights. And just so it is in the case now under consideration: the cases are precisely parallel: the creditor's rights are as sacred as the rights of the debtor.

The next and last point is, whether a law that has a retrospect beyond the time of its passage, so as to impair vested rights, is so repugnant to any fundamental principle of universal jurisprudence, as to be null and void?

Blackstone says that all laws should be made to commence *in futuro*, and not have a retrospective effect. Judge *Marshall* says that the better opinion is, that the nature of society and government is such, that even without a written *constitution* to that effect, the law-making power is by general principles confined within certain limits; and in Bacon's Abridgment it is said to be in the general true, that no statute is to have a retrospective operation beyond the time of its commencement.

In the case of *The Society, &c.* v. *Wheeler*, 2 Gall. 105, it was decided that the act of *New-Hampshire* allowing to occupying tenants the value of their improvements, on recoveries against them, was retrospective and void as to all improvements made before the law was passed, although the act was in general terms. In the case of *Gilmore* v. *Shuter*, 2 Show. 16, the same principle was decided. That was this:—The statute of frauds enacted that from and after the 24th day of *June*, &c. no action shall be brought whereby to charge any person upon an agreement made upon consideration of marriage, unless such agreement or some memorandum or note thereof be in writing. The suit was not brought until after the act was in force, which says "no action shall be brought," and it was upon a contract not in writing, but it was made before the act took effect. The Court held, that the act could not have a retrospect to take away an action upon a contract that was good in law when it was made. The case of *Couch, qui tam,* v. *Jeffries,* 4 Burr. 2460, is also in point. A penalty was given by statute to any person who would sue for the same, against all persons who failed to pay the stamp duty upon an indenture of apprenticeship. *Jeffries* violated the statute, and *Couch* brought suit for the penalty. The legislature, after the suit was brought, passed a general act giving relief generally to such delinquents: but the Court said

it came too late to give relief in that case; that the law as it stood when the suit was brought, authorised any person who pleased to commence it; and that as soon as the plaintiff had commenced the action, he had a vested interest in the penalty; and that the legislature, by a subsequent act, could not take it away; nor could the Court suppose that the legislature intended to take it away. In the case of *Calder* v. *Bull*, before noticed, the Court said that every *ex post facto* law is retrospective, but that every retrospective law is not *ex post facto*, but must generally be unjust; and that every law that takes away or impairs rights which exist by the law then in force, is retrospective, and is generally oppressive.

In the cases of *Kelly* v. *Harrison*, 2 Johns. Cas. 29,—*Jackson* v. *Lunn*, 3 Johns. Cas. 109,—and *Calvin's Case*, 7 Co. 1, it has been asserted as a principle of the common law, that a revolution, or a division of an empire, or a change of empire, creates no forfeiture of previously vested rights of property, not even of a foreign corporation; and that this principle is equally consonant with the common sense of men, and with the maxims of eternal justice. In the case of *Lewis* v. *Brackenridge*, 1 Blackf. Rep. 220, this point, as well as the one respecting the constitutional prohibition as to the passing of laws impairing the obligation of contracts, are both discussed by the Court; and it is in that case settled that a statute cannot have a retrospective operation, so as to divest a vested right of action. In the case of *Dash* v. *Van Kleeck*, 7 Johns. Rep. 477, the Court says that it is a principle of universal jurisprudence, that laws either civil or criminal, must be prospective, and cannot have a retrospective effect.

According to Bracton, it is a principle of the common law as old as the law itself, that a statute of even the omnipotent parliament of *England* is not to have a retrospective effect; and it is also a principle of the civil law, that the lawgiver cannot alter his mind to the prejudice of a vested right. Judge *Tucker* says, that though *ex post facto* laws, and those which impair the obligation of contracts, are alone prohibited by the constitution, yet the general sentiment of every enlightened jurist is opposed to laws of every description which are retrospective in their effects; that it is inconsistent with the very notion of law that it should be retrospective; and that it is justly and wisely said, that retrospective laws are inconsistent with sound legislation

and the fundamental principles of the social compact; that the power of the state is circumscribed by general principles, as well as by the constitution, and that all retrospective laws should be pronounced void.

It is freely admitted, that the importance and difficulty of the questions presented by this record, are deeply felt. The question of the extent of legislative power, and the question whether a law is void for its repugnance to the constitution, or to any fundamental principle, is at all times a question of much delicacy, and should always be approached with due caution, and should never be decided affirmatively in a doubtful case. The repugnancy and incompatibility should be clear, and the conviction strong and conclusive, before a legislative act should be declared null and void. But notwithstanding that, when such a point is directly made, and the Court is impelled by its duty to decide, it would be unworthy of further confidence, if it could be so unmindful of the obligation imposed on it, as to even hesitate to discharge its duty. No fear of responsibility, or dread of consequences, should ever have an abiding place in the council-chamber of a judicial tribunal.

In the case now before us, it is the unanimous opinion of the Court, that the rights of the defendant in error are not and cannot be impaired by the act of 1822, or by any of the subsequent acts, and that the demurrer to the plea was correctly sustained.

Judge *Tucker* says, that statutes are *prima facie* prospective in their operation, and it never should be presumed that the legislature intended them to be retrospective, unless they are made so by express words. The same is also said in the case of *Elliott's ex'r.* v. *Lyell*, 3 Call, 268.

In the statute now under consideration, there is nothing to authorise the presumption, that the legislature intended it to have a retrospective effect. The words of the statute are, "no mispleading or lack of pleading shall *hereafter* render any executor or administrator liable," &c. These words, both by their sense and their plain grammatical construction, authorise the Court to say that the legislature intended the word *hereafter* to apply, exclusively, to such mispleading and lack of pleading as might take place after the passage of the act, and not to such as had taken place before; and, indeed, that is the construction which at first naturally presents itself to every mind. It is however admitted, that it will also bear the construction given

to it by the plaintiff in error, but that the authorities do not authorise it; and the Court feels bound to say, that the legislature did not intend that provision to extend to those cases of mispleading and lack of pleading, which had then taken place at the time of the passage of the act (1). · ·

Nov. Term,
1833.
___

MARTINDALE
v.
MOORE.

Before this case is dismissed, it is perhaps proper to notice a few cases, which may be supposed to conflict in some particulars with this decision.

In the case of *Calder* v. *Bull,* the resolution of the legislature of *Connecticut* granting a new trial, would be clearly retrospective, had it been a legislative act, but the Court declared it to be a judicial act. It took place under the *British* charter, before that state had made for itself a written constitution; and under that charter the legislature had been, from the commencement of the colony, so far a part of the judiciary as to have the power to grant new trials, and had been in the continued exercise of that power; hence the Court declared the resolution to be a judicial act. In the case of *Fullerton et al.* v. *The Bank,* 1 Pet. Rep. 604, the statute in question would have been retrospective and void, if it had affected the rights of the parties; but the Court said that it only affected the remedy and not the rights of the parties. There is an obvious distinction between the statutes which operate upon the remedy only, and those which operate upon the rights of the parties. The remedies afforded by law for the enforcement of rights, are purely the creatures of legislative power, and subject at all times to alteration, at the pleasure of the legislature; and such statutes may be made retrospective in their operation in many instances, if it be so expressly declared. 1 Tucker's Comm. 3.—*Gaskins* v. *The Commonwealth,* 1 Call, 194.—*The Commonwealth* v. *Hewitt,* 2 Hen. & Munf. 186, *et seq.*—*Day* v. *Pickett,* 4 Munf. 104.

The case of *Satterlee* v. *Matthewson,* 2 Pet. Rep. 380, is the authority on which the plaintiff in error with great apparent confidence relied, to establish the principle that the legislature has the power to pass retrospective acts, which may impair vested rights, provided the obligation of a contract is not impaired. The great importance of the question requires a review of that case somewhat in detail; and the parts of history and the principal facts necessary to a proper understanding of it are these:—

In the month of *November,* 1768, a number of men and

families emigrated from the state of *Connecticut* into the northern part of *Pennsylvania*, and took possession of a tract of country about *Wyoming*, under a *Connecticut* title, alleging that the charter of *Connecticut* covered the soil in question, and that that charter being older than the charter of *Pennsylvania*, they were legally entitled to the land in question. *Pennsylvania*, also, claimed the same country, and had granted it, under her land system, to her citizens. A difficulty instantly ensued between those adverse claimants, which is known by the name of the *Wyoming* controversy. This warfare between those claimants was carried on for years, by a disorderly and illegal contest of individual force, and was attended with riots, bloodshed, and the loss of many lives. Finally the congress of the *United States*, under the confederation, appointed a Court of judges or commissioners to decide upon the claims of the respective states of *Connecticut* and *Pennsylvania*. These judges on the 30th day of *December*, 1782, made at *Trenton* their final decision, now known by the name of the decree of *Trenton*, establishing the right of jurisdiction and government of the disputed territory to be in *Pennsylvania;* but left the particular titles of individuals, claiming the right of soil, to be decided in some other way. In 1795, in the case of *Van Horne* v. *Dorrance*, 2 Dall. Rep. 304, the right of title to the soil was for the first time settled to be in *Pennsylvania* also. So soon as that question was settled, the legislature of *Pennsylvania* commenced passing acts to exterminate and put a final end to those *Connecticut* titles; and in that year, (1795,) and the year 1802, passed the two acts which produced the difficulty in deciding the case between *Satterlee* and *Matthewson*. These were the acts called the intrusion act, and the act suspending the statute of limitations as to those titles. These acts make it a penal offence, punishable with fines and imprisonment, and also labour as a convict, for any person to settle, enter, or intrude on those lands by colour of a *Connecticut* title, or to sell, possess, or convey any of those titles, &c. Under these acts, the Courts of justice of *Pennsylvania* decided, that no legal demand, claim, or right, could arise or exist by virtue of those titles, or by virtue of any contract respecting them, or bottomed on them. They decided that the vendor could not recover from the vendee the purchase-money, because the contract was in violation of those statutes, and the plaintiff had no right in a Court of justice.

They also decided, that the relation of landlord and tenant did not, and could not exist, between a landlord who held by those titles and his tenant, because the title, entry, possession, and the contract making the lease, were all in violation of those statutes, and the landlord had no right in a Court of justice. These acts, however, on which these decisions are founded, expressly excepted from their operation and effect, all entries, settlements, and contracts, made prior to the passage of the acts; and the acts themselves only continued in force until *January*, 1814, when they were repealed. 6 Smith, 122. These are substantially all the remote facts which have any bearing on the case. The immediate facts which constitute the gist of the action itself are these:—

In 1784 or 1785, *Matthewson* settled on the land in controversy, under a *Connecticut* title, and, in 1790, leased a portion of it to *Satterlee*. *Satterlee* occupied the land under the lease until in 1812, when he purchased in an outstanding adverse title, which, he said, covered the land he occupied as tenant to *Matthewson*; after which he claimed the land as his own. *Matthewson*, in 1816 or 1817, instituted an action of ejectment against *Satterlee* in the Court of Common Pleas of *Bradford* county, and upon the trial, *Satterlee* attempted to set up this outstanding adverse title which he had purchased, but the Court charged the jury, that the tenant could not set up an adverse title against his landlord during his life; that if he wished to dispute his landlord's title, he must first surrender his possession under his lease, and then institute his suit upon his own title which he had purchased. The jury found for *Matthewson*, and *Satterlee* removed the case to the Supreme Court of *Pennsylvania*, and that Court, in 1825, reversed the judgment of the Court of Common Pleas, awarded a *venire de novo*, and remanded the cause back to the Common Pleas of *Bradford* county for a new trial; because, that Court said, the relation of landlord and tenant could not exist between persons holding under a *Connecticut* title. Immediately after this decision, on the 8th of *April*, 1826, the legislature passed an act, by which it was enacted, "That the relation of landlord and tenant should exist and be held as fully and effectually between. *Connecticut* settlers and *Pennsylvania* claimants, as between other citizens of the commonwealth."

On the 10th of *May*, 1826, after the passage of this act, the

Nov. Term, 1833.

MARTINDALE
v.
MOORE.

ejectment again came on to be tried in the Court of Common Pleas of *Bradford* county, and the judge, after stating the above recited act, charged the jury that "it is a general.principle of law founded on wise policy, that the tenant shall not controvert the title of his landlord, and prevent the recovery of his possession, by showing that the title of. the landlord is defective; that the Supreme Court had in that case decided, that when the landlord claimed under a *Connecticut* title, the relation of landlord and tenant could not exist, but that the legislature had thought otherwise, and he should be bound by their decision. *Matthewson* again recovered, and *Satterlee* again carried the case to the Supreme Court of *Pennsylvania*, but that Court affirmed the judgment of the Court of Common Pleas. *Satterlee* then carried the case to the Supreme Court of the *United States*, and assigned as a principal error, the following, viz:—that the act of the 8th of *April*, 1826, is repugnant to the constitution of the *United States:* and this was the only error assigned, which gave that Court jurisdiction of the case.,

The decision of the Court was in substance this:—This is a controversy between citizens of the same state, respecting an act of the legislature and a decision of the Supreme Court of the same state, and the Supreme Court of the *United States* has no power to interfere with it, or to reverse the decision of the state Court, unless the statute in question is repugnant to the constitution of the *United States*. It may be true that this statute is unwise and unjust, and it may be true that it is an exercise of a judicial function by the legislature, and it may also be true that it is retrospective in its operation, but this Court has no power to inquire into that. The only question for us to decide is, whether it is repugnant to the constitution of the *United States?* If it is neither an *ex post facto* law, nor a law impairing the obligation of contracts, our power is at an end; and it is not an *ex post facto* law because it is not penal, nor does it impair the obligation of any contract known to the record, and, therefore, is not repugnant to the constitution of the *United States*.

There is, certainly, nothing in this decision to sustain any position assumed by the plaintiff in error in this case.

We will now return to the opinion of the Supreme Court of *Pennsylvania*. That Court, in 1825, decided that the relation of landlord and tenant did not exist between *Satterlee* and

Nov. Term, 1833.

MARTINDALE
v.
MOORE.

*Matthewson*, because *Matthewson* claimed under a *Connecticut* title. Now it is clear, that that decision was erroneous. There was no such law in *Pennsylvania* at that time; the statutes out of which that rule of decision grew, having been repealed in 1813 and 1814, before that suit was commenced; and as to the settlement and claim of *Matthewson*, and the lease between him and *Satterlee*, there never had been any such law or rule of decision. Those acts upon which that rule of decision was founded, were passed ten or eleven years after *Matthewson* had made his settlement, and about five years after the lease was made to *Satterlee*, and *Satterlee* was in possession under it. Upon general principles, then, these statutes were, as to *Matthewson* and *Satterlee*, retrospective and void. They were, also, in conflict with the constitution of the *United States*, being penal statutes; they were, as to *Matthewson* and *Satterlee*, ex *post facto* laws and void. The legislature, however, did not leave their operation to be regulated by the controlling power of the constitution and general principles, but expressly declared upon the face of the intrusion act, that they should not affect those who had made settlements before the passage of the first act in 1795. These statutes were not even intended by the legislature, to be retrospective in their operation; and to prevent any such construction, it was stamped upon their face that they were to be applied only to those who might settle, enter, or intrude, after the date of the passage of the first act in 1795.

The act of the 8th *April*, 1826, was not then a retrospective act, as has been supposed, but was simply a declarative act declaring what the law was, and not an act creating and making new law.

Mr. Price and Mr. Peters, in the argument of that case before the Supreme Court of the *United States*, both say, that the decision of the Supreme Court of *Pennsylvania* of 1825, must have been an oversight; that it is evident from the report of the case, that the impression upon the minds of the judges was, that the intrusion act was in full force, and that it applied to the case before them; that it no where appears in the opinion of the Court, or in the arguments of counsel, that those acts were repealed, or that they did not extend to the case before them; and they both further say, that the opinion of the Court was based upon the case of *Mitchell* v. *Smith*, 1 Binn. Rep. 110,

a decision which was made under those statutes while they were in force, in a case to which they applied, without ever recurring to the fact of the repeal of the statutes, or the fact that they did not, when in force, extend to the case of *Matthewson* and *Satterlee*. But this is not all; the Supreme Court itself has shown that it committed an error, not indeed in so many words, but by its after decisions. At the very next term after the decision was made in 1825, in *Matthewson* and *Satterlee's* case, the case of *Overton* v. *Tracy*, 14 Serg. & Rawle, 311, came on to be tried, and they then decided that the disabilities of settlers under *Connecticut* titles were at an end, and that contracts respecting them, and founded upon them, were good and valid in law. This shows almost conclusively, that the Court thought that a mistake was made in the first decision, and that the law was not as it had by that decision been declared to be. And in the last decision of that Court, of this case of *Matthewson* and *Satterlee*, when the decision of 1825 in the same case is directly reversed, the Court does not base its decision upon the act of the legislature of the 8th of *April*, 1826. The decision of the Court of Common Pleas is simply affirmed on all the five points of error assigned, without any reference to the statute. It is, then, fairly to be presumed, that that Court viewed that statute simply as a declaratory act, and not as an act creating or attempting to create, new and retrospective law. If it had not been so viewed, something would certainly have been said about it.

This great case, then, in all its important points, appears to be rather adverse to the position taken by the plaintiff in error in this case; at least, there is nothing in it that sustains him.

*Per Curiam.*—The judgment is affirmed with costs.

*J. Rariden*, for the plaintiff.

*O. H. Smith*, for the defendant.

(1) That the statute of 1822, referred to in the text, does not apply to judgments against executors or administrators, rendered before its passage, was decided by this Court in 1830, in the same case between these parties. *Moore, adm'r.* v. *Martindale, adm'r.* Vol. 2, of these Rep. 353. And, again, in 1831, on a petition for a re-hearing of the cause, the Court gave the same opinion, and overruled the petition. See a similar statute to that of 1822, in Rev. Code, 1831, p. 169.