## SPRIGG v. STUMP.

*(Circuit Court, D. Oregon. August 10, 1881.)*

1. ADJUDICATION OF INSANITY.

An order of a county court adjudging a person insane, under the asylum act of September 27, 1862, (Or. Laws, 620,) is valid, and authorized the subsequent appointment of a guardian for such person, as insane, although the application for such order was not verified, and such insane person was brought before said court, upon the order thereof, by being taken into the custody of the sheriff, without cause being shown therefor upon oath or affirmation.

2. WARRANT.

The warrant prohibited by section 9 of art. 1 of the constitution of Oregon from issuing, without cause being shown therefor on oath or affirmation, is process for the arrest of a person on a criminal charge for the purpose of bringing him to trial or answer therefor, and does not include an order of a county court requiring an alleged lunatic to be brought before it for examination, for the purpose of being committed to an asylum; and if such order and the arrest were invalid, as not being made on oath, that would not render the subsequent inquisition of lunacy, commitment to the asylum, and appointment of a guardian invalid.

3. DIRECTORY STATUTE.

Section 21 of the act of June 4, 1859, (Sess. Laws, 12,) providing that the proceedings of the county court in law cases, probate and county business, shall be kept and entered in separate books, is only directory, and an order or judgment of said court entered in any of its books of record is nevertheless valid; and, *quære*, does the inquisition of lunacy authorized by the asylum act of September 27, 1862, (Or. Laws, 620,) to be had by and before the county *judge* on the "application of any citizen in writing," belong to either of these three classes of business, and may not the action of the judge therein be duly shown by orders reduced to writing and signed by him, and filed in the county clerk's office?

4. SALE OF LANDS BY GUARDIAN.

A county court has jurisdiction to license the sale of lands by a guardian appointed by itself, upon the presentation by such guardian of a verified petition therefor, stating the condition of the ward's estate and the circumstances tending to show the necessity or expediency of such sale; and the petition is sufficient to give jurisdiction when the order granting the license is attacked collaterally, if it appears therefrom, or by reasonable inference from the facts stated therein, that the ward had no income, and that it was necessary to sell his land to maintain him in the insane asylum as provided by law.

5. JUDGMENT NUNC PRO TUNC.

When and under what circumstances it may be entered.

Motion for New Trial.

*W. W. Chapman,* for plaintiff.

*Walter W. Thayer,* for defendant.

Before SAWYER, C. J., and DEADY, D. J.

DEADY, D. J. This action is brought by the plaintiff, a citizen of Arkansas, against the defendant, a citizen of Oregon, to recover the possession of the undivided half of donation No. 49, situate in Polk county, and containing 320 acres, and damages for the detention thereof, alleging that he is the owner of the same in fee, and entitled to the possession thereof in common with James F. Levins, the owner of the other undivided half of the property.

The defendant by his answer denies the allegations of the complaint as to the ownership of the premises, and the plaintiff's right to the possession thereof, and pleads title in himself and a former adjudication.

The case was tried before the district judge with a jury, who, under the direction of the court, found a verdict for the defendant. Thereupon the plaintiff moved for a new trial, which was argued before the circuit and district judges, and taken under advisement. On the trial the plaintiff gave evidence tending to prove that one William Fulton, in his life-time, was the owner of the premises, and that he died intestate in 1876, leaving a niece and nephew—the plaintiff and said Levins—as his sole heirs at law, who thereupon became and still are entitled to the possession of the same.

In support of the plea of former adjudication the defendant offered in evidence the judgment roll of an action brought on February 29, 1875, in the circuit court of the state, for Polk county, by the guardian of said William Fulton, then an insane person, against the defendant herein, to recover possession of said premises, in which there was a verdict for the defendant, in December, 1875, and a judgment entered thereon on May 14, 1879, as and for December 10, 1875, and some years after the death of said Fulton, which, upon the objection of the plaintiff, was excluded from the jury on the ground that the court had no authority to order the entry of said judgment *nunc pro tunc,* because (1) there was then no plaintiff in the action; and (2) the term at which the judgment should have been entered had passed by. See Or. Civ. Code, §§ 262, 265.

The defendant then gave in evidence, against the objections of the plaintiff, certified copies of a petition of J. L. Collins to the county court of Polk county, and filed therein on February 2, 1863, alleging that said Fulton "is laboring under mental derangement" and "suffering from neglect," and asking the court "to inquire into the mat-

ter" and dispose of it, according to the act of September 27, 1862, entitled "An act to provide for the safe-keeping and treatment of insane and idiotic persons," and the proceedings thereon, from which it appears that said Fulton was by order of said court brought before it by the sheriff, on March 3, 1863, and upon the evidence of David Pyle, a physician, that he was "an insane person," was sent to the insane asylum, at Portland, where he was received on March 4, 1863; and certified copies of the application of David W. Allingham, on March 7, 1863, to be appointed guardian of said Fulton, and the order thereon, of the same date, appointing said Allingham guardian of the estate of said Fulton, in which it is recited that the latter had "been duly convicted of insanity, and sent to the insane asylum at Portland;" the oath of said Allingham, as guardian, dated April 7th; his bond, dated April 25th and filed May 4th; the letters of guardianship issued to him on May 4, 1863, and the exhibit of the estate verified and filed July 5, 1865; and certified copies of the petition of said guardian to said county court to sell the real property of said Fulton, verified and filed on October 2, 1866, in which it is alleged "that said Fulton is an insane person now confined to the insane asylum of the state of Oregon; that the personal property of the said Fulton is not sufficient to pay expenses accruing in consequence of the necessary care and treatment of the said Fulton; that as there is but little hope of the recovery of said Fulton from his insanity, if the sale of the said lands should be more than sufficient to meet the wants of the said Fulton while insane, the money put at interest will ultimately be of greater value to the said Fulton, in any event, than the real estate." The order setting the petition for hearing on November 6th, and directing notice thereof to be given by publication for three weeks, to all persons interested; the order dated November 7th, allowing the sale, wherein it is stated that "it appearing to the court that it would be for the best interest of said ward to sell the" real property belonging to said Fulton, it is ordered that said guardian sell the same as by law required, describing, among others, the premises in controversy by metes and bounds; the oath of the guardian, of the same date, to dispose of the property "as will be most for the advantage of all persons interested therein;" the bond of said guardian in the penal sum of $10,000, conditioned to sell such property and account for the proceeds of the sale as provided by law, dated January 7, 1867, and filed March 11th; the certificate of the sheriff of said county, filed on February 6th, stating that the premises were

sold by him, "at the instance of said guardian, on January 8, 1867, to Alexander Hodges, he being the highest bidder therefor, for $960 in gold coin, payable in five years, with interest at the rate of 12 per cent. per annum, payable in advance, and secured by mortgage on the premises; and the order of said court dated February 7, 1867, confirming said sale and directing the guardian to execute a conveyance thereof to the purchaser." The guardian conveyed to Hodges on March 11, 1867, who, on October 10, 1870, conveyed the north half of the premises to J. S. Bevens and the south half to M. R. Davis, who afterwards conveyed to the defendants—the latter on October 26, 1871, and the former on December 7, 1872.

The first point made by the plaintiff in support of the motion for a new trial is that the court erred in admitting the copies of the proceedings upon the inquisition of lunacy, because the originals were void, not having been kept and entered in the proper book. To understand this objection it is necessary to premise that the county court "has the jurisdiction pertaining to probate courts and boards of county commissioners, * * * and such civil jurisdiction, not exceeding the amount of value of $500, * * * as may be prescribed by law." Const. art. 7, § 12. And by section 876 of the Civil Code it is provided that these three kinds of business, to-wit, (1) leases at law; (2) probate business; and (3) county business, "shall be entered and kept in separate books;" and the argument of the plaintiff is that these orders belong to probate business, but have been entered in the book with county business, and are therefore void. The argument assumes that said section 876 was in force when these transactions took place. But this is a mistake. The Civil Code, although passed on October 11, 1862, did not take effect until June 1, 1863. But upon examination we find that substantially the same provision concerning "the settlement of the estates of minors, idiots, and lunatics, and all cases of the nature of probate," and "all county business," was contained in section 21 of the act of June 4, 1859, relating to county courts, (Sess. Laws, 12,) and then, and until June 1, 1863, in force and applicable to these proceedings.

It does not appear from the certificate of the clerk to these copies, dated October 13, 1874, that the originals were not entered in a separate book. On the contrary, the fair inference from the certificate is that they were so kept. The clerk describes himself as "the keeper of the probate records," and then certifies that the transcript is a true copy of the original orders made by the court in the "commitment" and estate of William Fulton. But on the hearing of the

motion for a new trial the plaintiff read a duly-certified transcript, dated March 11, 1881, of the whole record of the proceedings of the county court for the months of February and March, 1863, doing county business, in which is found the entry of the proceedings upon the inquisition of lunacy in the case of William Fulton, to which is added in the certificate the statement that no entry concerning such inquisition is found in the record of probate business.

Assuming that this is sufficient evidence of the fact that the proceedings on the inquisition of lunacy were kept in the record of county business, and not that of probate business, and that the plaintiff is excusable for not producing such evidence on the trial if he deemed it material, what is the effect of it?

At the date of the act of June 4, 1859, *supra*, and until September 27, 1862, there was no insane asylum in the state, and a county court had no authority to make or hold an inquisition of lunacy except for the purpose of appointing a guardian of the lunatic's person and estate, upon the application in writing of certain persons named. Act of December 15, 1853, (sections 9 and 10, Or. Laws, 555.)

On September 27, 1862, an act was passed "to provide for the safe-keeping of insane and idiotic persons." Section 1 of this act authorized the governor to contract with "some suitable person" for the safe-keeping of the insane. Section 2 was merely a rehash of the law then in force, authorizing the county court to appoint a guardian for the person and estate of a lunatic, without any reference to it. Section 3 authorized "the county *judge* of any county, * * * upon the *application* of any citizen *in writing*," stating that any person "is suffering under mental derangement," to cause such person "to be brought before him, at such time and place as he may direct," then and there to be examined by "one or more competent physicians," selected by said judge. If upon such examination the physician should "certify on oath" that the person examined was insane, then the judge was required to cause such person to be placed in charge of the contractors for keeping the insane, primarily at the expense of the state; but it was also made the duty of the county judge to see that the estate of the insane person, if any, was applied to meet such expense. For the first two years the price paid was $12 per week, and for the next four years $10. From this it will be seen that it is doubtful to what class of business an inquisition of lunacy taken under the act of 1862 belongs. It does not come within the enumeration of the act of June 4, 1859, and was not authorized when that act was passed. It is somewhat *sui generis*. The proceeding

need not be in court, but may be had before the county judge at any time and place he may name; and for aught that appears may be kept on paper and not entered in any book. In this particular case it seems the judge likened it to county business, and had the proceedings entered and kept accordingly as of a regular term of the court. But admitting that he erred in this matter, and that the inquisition should have been kept and entered in the records of the probate business, as claimed by the plaintiff, still the result is not affected by this mistake of the officer. The act directing the business transacted in the county court to be kept and entered in different books, according to a certain classification of the same, is so far a mere regulation for convenience, and not of the essence of the thing to be done, and therefore only directory. When a statute gives directions or makes provisions concerning the time and manner of doing an official act, affecting the rights and duties of third persons, it will generally be considered directory, unless the nature of the act to be done or the language of the statute indicates the contrary. Smith's Com. § 670; Cooley's Const. Lim. 74; *Toney* v. *Milbury*, 21 Pick. 67; *Corbet* v. *Bradley*, 7 Nev. 107; *People* v. *Cook*, 14 Barb. 290; S. C. 8 N. Y. 67; *Rex* v. *Foxdale*, 1 Bur. 447. In this latter case Lord Mansfield said: "There is a known distinction between circumstances which are of the *essence* of a thing required to be done by an act of parliament, and clauses merely *directory*."

In the case under consideration there is nothing in the nature of the act to be done, nor the language of the statutes directing it to be done, that indicates that it was the intention of the legislature to make the validity of a judgment or order of a county court, duly given or made, depend upon the fact that it is recorded in a particular book; and that if, from the ignorance or negligence of the clerk, it is entered in the wrong one it is therefore void. The statute requiring the proceedings in this inquisition of lunacy to be kept and entered in a particular book with a certain class of business is merely directory; and, although the officer ought to have obeyed it, third persons are not to suffer for his omissions to do so. The entry of the proceedings in the records of the court was essential,—the essence of the thing to done; but whether in a book of this or that class of business was a mere matter of convenience, and the statute providing for it is therefore directory.

The plaintiff also insists that the inquisition is void because taken upon a petition not verified, because, as counsel states it, Fulton was arrested and imprisoned in the asylum without "probable cause,

supported by oath or affirmation," contrary to section 9 of art. 1 of the constitution of the state, which provides that "no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." This provision is copied from the fourth amendment to the constitution of the United States, and was placed there on account of a well-known controversy concerning the legality of general warrants in England, shortly before the revolution, not so much to introduce new principles as to guard private rights already recognized by the common law. 2 Story, Const. 1902; Conk. Treat. 615. These warrants were issued from the secretary's office for the arrest of persons concerned in printing and publishing of obscene or seditious libels, without naming any one. At length, in *Mooney* v. *Leach*, 3 Bur. 1742, (Anno 1765,) they were declared void for uncertainty, the case being as to the leaglity of such a warrant issued by the Earl of Halifax, without information on oath, commanding the arrest of "the printers and publishers" of a "seditious libel entitled the North Briton, No. 45," without naming any one. And on April 22, 1766, the house of commons voted that such warrants were illegal. 4 Black. Com. 292, note *k*.

The law, as thus declared, was put beyond controversy, as to the government of the Union, by this fourth amendment, and from there transferred to the constitution of the states. At the same time, there being some doubt whether the common law absolutely required that a warrant should issue only upon information on oath, the clause concerning probable cause on oath was added. Hale's P. C. 582; 4 Black. 290; *Mooney* v. *Leach, supra;* De Grey, *arguendo,* 1764.

Undoubtedly, then, the legal effect of this provision of the constitution is that process of any kind for the arrest of a person upon a criminal charge is void, unless issued upon sufficient information under oath, and an arrest thereon is unlawful. *Ex parte Ruford,* 3 Cranch, 448.

But it is not so clear that the inquisition authorized by said section 3 of the asylum act involves the issue of a warrant and an arrest thereon of the alleged insane person, within the meaning of this provision. The county judge is to cause such person to be brought before him, which may be accomplished by going to him, as the act allows the judge to appoint the time and place for the inquisition. But, ordinarily, a person "laboring under mental derangement" can only be brought before the county judge, in the usual sense of the phrase, by a resort to force or artifice. In this case there was an

order directed to the sheriff co mmanding him to bring Fulton before the court "on the presumption of insanity," to be dealt with according to the statute, and the sheriff made a return thereon that he "arrested" the person named and brought him before the court. This order, judged by its purpose and mode of execution, was, in effect, a process for the arrest of Fulton issued without information upon oath. But all process for the arrest of a party is not included in the word "warrant" as used in the constitution. A *capias*, or writ of arrest in a civil action, is not a "warrant" in that sense, and it is issued at common law as a matter of course, without oath. 3 Black. 281. A warrant within the meaning of the constitution is an authority for the arrest of a person upon a criminal charge, with a view to his commitment and trial thereon.

The arrest of a person upon a charge of insanity, for the purpose of his commitment or confinement in an insane asylum, is, strictly speaking, neither an arrest in a civil or criminal proceeding, but is one *sui generis*. Still it partakes more of the character of the latter than the former, and ought not, in this day of regard for personal liberty, to be allowed otherwise than upon information on oath. This act, which practically allows the arrest of a person upon the charge of insanity on the unverified statement of any citizen, and his commitment to the asylum upon the verified statement of any one "physician" selected by the county judge that he is insane, was probably prepared and passed in the interest of the contractors, who naturally enough wanted the entry to the asylum made expeditious and easy.

At common law the king was the guardian of lunatics, and the custody of them was entrusted by him to the chancellor. Upon a petition or information alleging the insanity of any one, the chancellor granted a commission to inquire into the matter by the verdict of a jury; and, if the person was thus found insane, committed him to the care of some friend, called his committee. 1 Black. 304. This petition was probably not upon oath, but the party was not restrained of his liberty until after the verdict of the jury which established his insanity.

In the draft of the New York. Code of Civil Procedure, §§ 1563–1574, (1849,) the appointment of a committee for an insane person is provided for. The application is made to the surrogate by a verified petition stating the facts, and inquisition thereon is made by a jury at the place of the party's residence, upon notice to him and some member of his family; and in the draft of the Civil Code, §

139, (1865,) a county judge is authorized to commit a person to an insane asylum, being "first satisfied by the oath of two reputable physicians that such person is of unsound mind, and unfit to be at large;" and even then the party, "his or her husband or wife, or relative to the third degree," may demand and have an inquisition of lunacy by a jury.

But admitting, what we think very doubtful, that the order upon which Fulton was arrested and brought before the county judge, although in the form of the statute, was void, as being in conflict with section 9, *supra*, of the constitution, concerning the issue of warrants, still the subsequent inquisition by the judge, and the order thereon committing Fulton to the asylum, are founded upon the oath of the physician who examined him and pronounced him insane. If, then, the validity of the subsequent appointment of a guardian and the sale by him of the lunatic's property depend upon the legality of the procedure in which Fulton was declared insane, it is certainly sufficient if the inquisition and commitment were legal, even if the original arrest was otherwise. So long as the order of the county court committing Fulton to the asylum remained unreversed and in force, he could not have been discharged therefrom on *habeas corpus* on the ground that he was illegally restrained of his liberty, whatever might be thought of the legality of the order on which he was brought before the court. It follows that, when Allingham applied to be appointed guardian of Fulton, the latter was lawfully adjudged insane and committed to the asylum. This application was made under sections 9 and 10 of the act of 1852, *supra*, and might have been made and heard without reference to the previous action of the court under the asylum act of 1862, in which case the question of Fulton's insanity would have been tried and determined by the county judge as an ordinary question of fact. But the application was made upon the assumption that the matter of Fulton's insanity was *res judicata*, and the order appointing the guardian so recites. But no particular objection is made to this order upon the ground that, in making it, the question of insanity was not considered an open and original one. The claim of the plaintiff is that all the proceedings as to the custody and sanity of Fulton, and the management and disposition of his estate, depend for their validity upon the legality of the order of February 3, 1863, directing Fulton to be brought before it upon the charge of insanity, and his arrest thereon. But, as we have seen, the order was probably well made, although upon information, not

under oath, and if this were otherwise the legality of the subsequent inquisition and adjudication of insanity is not affected thereby.

Assuming, then, as we do, that Fulton was lawfully adjudged insane, and that such adjudication authorized the appointment of a guardian without any further inquiry or finding on the subject, the only remaining question in this case is, was the sale of the premises by the guardian legal? and the answer depends upon the sufficiency of the petition of the guardian for the order of sale.

The act of December 16, 1853, (Or. Laws, 738,) provides that when "the income of the estate" of "a minor, insane person, or spend-thrift" is insufficient to maintain the ward and his family, his guardian may sell his real estate for that purpose upon obtaining a license therefor from the county court; and he may make such sale upon obtaining such license, and invest the proceeds "in some productive stock," or put them "out on interest," when "it shall appear upon the representation" of such guardian "that it would be for the benfit of his ward." Sections 1 and 2.

To obtain this license the guardian must present to the court "in which he was appointed guardian a petition therefor, setting forth the condition of the estate of his ward, and the facts and circumstances under which it is founded, tending to show the necessity or expediency of such sale, which petition shall be verified by the oath of the petitioner." Section 6. Upon this petition, if it appears therefrom that such sale "is necessary," or "would be beneficial for the ward," the court is authorized to grant the license to sell, upon notice to the next of kin and others interested in the estate. Section 7.

Section 20 of the act provides that in an action relating to property sold by a guardian, in which any person claiming under the ward shall contest the validity of such sale,—

"The same shall not be avoided on account of any irregularity in the proceedings, provided it shall appear—(1) That the guardian was licensed to make the sale by a county court of competent jurisdiction; (2, 3, and 4) that he gave the bond, took the oath, and gave notice of the time and place of sale, as prescribed by law; and (5) "that the premises were sold accordingly, at public auction, and are held by one who purchased them in good faith."

This provision of this act was evidently framed upon the theory that the then territorial courts of probate were not courts of general jurisdiction, and that the evidence of their jurisdiction and its regular exercise must appear on the face of their proceedings; and by way of

securing the same from collateral attack, within certain limits, provides that they shall not be so questioned, unless for one of the errors specified in the aforesaid five particulars. But the constitution of the state, as expounded by the supreme court in *Tustin* v. *Gaunt*, 3 Or. 306, having conferred the jurisdiction of probate matters upon the county courts and made them courts of general jurisdiction, their judgments in this respect, but for this statute, could not now be questioned collaterally upon any ground except that of jurisdiction. *Gager* v. *Henry*, 5 Sawy. 237.

But no question is made in this case as to the sufficiency of the bond and oath of the guardian, or the notice and manner of sale; and, if the court acquired jurisdiction to grant the license to sell, the sale was valid. It is true that the bond does not affirmatively appear to have been approved by the judge as required by the statute, (section 20, *supra*,) and was not filed until after the sale. But no objection was made on the trial to its admission on these grounds, and it is too late to do so now if desired. On the argument it was suggested that the county court of Polk county had jurisdiction to license this sale, because, in the language of the statute, (section 6, *supra*,) it was the court in which the guardian who made it was appointed, and therefore its regularity cannot be inquired into in this action. But we think the more reasonable construction of the clause (section 20, *supra*)—"was licensed to make the sale by a county court of competent jurisdiction"—is that the court which licensed the sale must not only have had jurisdiction potentially of the class of cases to which this belongs, but must have actually acquired it in this particular one by the presentation of a proper petition therefor—one containing the jurisdictional facts.

In *Gager* v. *Henry*, *supra*, this court—*Field* and *Deady*, JJ.—held that the application of a guardian to sell the lands of his ward was a proceeding in the nature of a proceeding *in rem*, conducted by the ward through his guardian in the interest and for the benefit of the former; that the court acquires jurisdiction thereof upon the filing of a proper petition therefor; and that the judgment of the court upon said petition cannot be questioned collaterally except as provided by statute.

But the plaintiff contends that the order licensing this sale was void, because the petition therefor was not sufficient to give the court jurisdiction, for the reason that it does not state with sufficient particularity "the condition" of the ward's estate, or "the facts and circumstances" "tending to show the necessity or expediency of such

a sale;" citing *Stuart* v. *Allen*, 16 Cal. 474; *Fitch* v. *Miller*, 20 Cal. 352; *The Estate of Smith*, 51 Cal. 563.

In the latter of these cases the question as to the sufficiency of the petition to sell arose upon demurrer, and was decided upon an appeal and therefore it is not in point.

The first case (*Stuart* v. *Allen*) involved the validity of a sale by an administrator upon an order of the probate court, which was alleged to be void because the petition therefor did not state facts sufficient to give the court jurisdiction; that is, did not state the amount of the personal estate that had come to the hands of the administratrix, and how much thereof remained undisposed of. The petition referred to the inventory of the personal property on file, and stated that "it was wholly insufficient to pay the indebtedness." The court held that the petition was sufficient to give the court jurisdiction, and that the sale was valid; saying, (page 501:)

"In order to the exercise of jurisdiction, it is not necessary that there should be a literal compliance with the directions of the statute. A substantial compliance is enough. Nor is it essential that there should be in the petition itself, and without reference to any other paper or thing, a statement of these facts. The main fact required is the averment of the insufficiency of the personal assets, and mere formal defects in the mode of statement would not affect the jurisdiction. The reference to the inventory makes, for all purposes of the reference, the inventory a part of the petition. The amount of the personal estate is shown by the inventory, as is also the value."

It is also to be remembered that the application for license to sell, by an administrator, is unlike the application by a guardian, and is a proceeding adverse to the interests of others than the applicant, or those represented by him. In such case the heirs to whom the real property belongs are interested adversely to the application, as their land cannot be subjected to the payment of debts until the personalty is exhausted, and therefore there is reason for requiring a statement of facts in the petition in the one case that are unnecessary in the other. And therefore the California statute, (section 155,) substantially like the Oregon one, (Or. Civ. Code, § 1114,) provided that "the petition of the administrator should state the amount of the personal estate that has come to his hands, and how much thereof, if any, remains undisposed of, the debts outstanding against the deceased," etc.

The second case (*Fitch* v. *Miller*) involved the validity of a guardian's sale that was contested on the ground, among others, that the facts stated in the petition therefor were insufficient to give the court jurisdiction. The statute prescribing what the petition should con-

tain was substantially the same as the Oregon one, (section 6, *supra.*)

The petition was held sufficient, the court saying (page 383) that it was only necessary to state the "condition" of the ward's estate so as to enable the court to judge whether a sale was necessary or expedient for the purposes permitted.

In this case the verified exhibit or sale bill, filed July 5, 1865, was introduced in evidence by the defendant, upon the theory that, being a part of the files of the case when the court granted the license to sell, this court ought to assume that the facts contained in it were known to the county court, and taken into consideration by it in acting upon the petition.

From it, it appears that, at the time of the application for license to sell, the personal property belonging to the estate had been sold, and that the proceeds, together with the sums collected on debts and rents due the estate, amounted to $1,928.31, and that there had been paid out on account of the estate, not including $632 charged for guardian's services, the sum of $1,819.90. Taking this exhibit as a part of the petition, there can be no doubt but that it appeared therefrom that the personal property was exhausted. But in *Gregory* v. *Taber*, 19 Cal. 409, it was held that an inventory or other paper on file in the matter of an estate, and not referred to in the petition, could not be considered a part of it.

It may be admitted that the petition in this case did not sufficiently set forth the "condition" of the ward's estate, and that it would have been held bad on demurrer. To do this, the petition should have stated of what the estate consisted, its value, and productiveness, if any. But it is stated that the personal property is not sufficient to pay the expense of supporting Fulton in the asylum, and the amount of this the court judicially knew to be $624 a year until 1865, and $520 a year thereafter. It is also in substance averred that the condition of the estate is such that it is necessary to sell the real property to maintain the ward in the asylum; which, by a reasonable if not a necessary implication, amounts to an averment that the income of the property is insufficient for that purpose, and that in addition it will be for the benefit of the ward to convert the land into money and loan it, so far as the proceeds are not necessary for his immediate maintenance.

These allegations, however defective or imperfect, are sufficient, we think, to give the court jurisdiction to make the inquiry. In effect it is stated that the condition of the estate is such that the

income, if any, is not sufficient to support the ward in the asylum, where he is likely to remain, and that the personal estate is not sufficient to defray the expenses already incurred for that purpose; and also that it would be for the benefit of the ward to convert his land into money.

Upon either or both of these grounds the court had authority to license the sale upon this petition, and having done so the purchaser thereat acquired a good title. This being so, the motion for a new trial must be denied, and it is so ordered.